[No. A139464. First Dist., Div. Five. Dec. 10, 2014.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUCHEHR RAHBARI, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.–III., IV.A., IV.B.1., IV.B.3.–4. and IV.C.

COUNSEL

Amos Lawrence, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share and Luke Fadem, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SIMONS, J.**—Appellant Manuchehr Rahbari was convicted of passing checks with insufficient funds. He was sentenced, pursuant to Penal Code section 1170, subdivision (h) (section 1170(h)),[1] to a term in county jail followed by mandatory supervision. The trial court also ordered appellant to pay restitution to certain victims. In the published portion of our opinion, we conclude that the scope of a victim restitution order issued in connection with a sentence pursuant to section 1170(h) is limited to those losses caused by the crime or crimes of which the defendant was convicted. In the unpublished portion of our opinion, we address the remainder of appellant's claims.

## BACKGROUND

In March 1985, appellant was charged by complaint with 26 counts of passing checks with insufficient funds (§ 476a, subd. (a))[2] and one count of grand theft (§ 487). Appellant was not arrested on these charges until 2012.

At a June 2013 bench trial, the evidence was as follows. In 1980 or 1981, appellant and Andy Saberi jointly owned gasoline stations. For one of their stations, appellant and Saberi held a joint bank account at Security Pacific National Bank (the SPNB account). Appellant was responsible for the day-to-day management of this station and had access to the SPNB account checkbook approximately 99 percent of the time. The average balance in the SPNB account was $20,000 to $30,000.

---

[1] All undesignated section references are to the Penal Code.

[2] Section 476a, subdivision (a), provides, "Any person who . . . willfully, with intent to defraud, makes or draws or utters or delivers a check, draft, or order upon a bank or depositary, a person, a firm, or a corporation, for the payment of money, knowing at the time of that making, drawing, uttering, or delivering that the maker or drawer or the corporation has not sufficient funds in, or credit with the bank or depositary, person, firm, or corporation, for the payment of that check, draft, or order and all other checks, drafts, or orders upon funds then outstanding, in full upon its presentation," is guilty of a criminal offense.

For two of appellant and Saberi's other stations, Roger Allen held a nominal 1 percent interest. Because the gasoline supplier would only accept payments from Allen in connection with these stations, appellant and Allen held a joint business account at Bank of America (the BOA account). Allen signed checks to the supplier but otherwise had no involvement in the stations or with the BOA account.

In March 1984, 26 checks from the SPNB account—dated on four consecutive days, signed by appellant, and made out to "cash"—were deposited into the BOA account. The checks totaled approximately $235,000. No single check exceeded $10,000; at the time, banks were required to report checks over $10,000 to the government. Appellant admitted the endorsement signatures on the back of the checks "look[] like mine" but denied endorsing the checks.

John Roth, a Bank of America investigator in the 1980s who was familiar with Bank of America's business practices at that time, testified that when a check was deposited into a Bank of America account, Bank of America sent the check to the drawee bank. While the check was being processed by the drawee bank, Bank of America might credit the account in the amount of the check, depending on the customer's creditworthiness. If the drawee bank returned the check to Bank of America instead of paying it, Bank of America debited any amount credited to the Bank of America account and sent the account holder a form notice, called a return item advice letter.

Roth reviewed the various stamps and markings on the 26 checks from the SPNB account and associated return item advice letters. Based on this review, he confirmed that Bank of America had sent these checks to Security Pacific National Bank and subsequently received the returned checks stamped with the notation "NSF S.P.N.B." Roth testified that NSF stood for nonsufficient funds. Subsequently, Saberi and Allen were contacted by their respective banks regarding insufficient checks and both attempted, unsuccessfully, to locate appellant. Neither Saberi nor Allen saw or heard from appellant again until after his arrest. Saberi and Allen were held liable for overdrafts on the SPNB account and BOA account, respectively.

An expert in check kiting testified this conduct was consistent with "a classic case of basic check-kiting," whereby "a person having two checking accounts for two separate banks, tak[es] checks from one bank knowing there's non-sufficient funds to back those checks, deposit[s] them into their other banking account over a . . . very short period of time, several days, high-dollar amount checks, then make[s] cash withdrawals based off those deposits before the bank catches on."

Appellant testified in his own defense that he was the sole owner of the station linked to the SPNB account and the sole owner of the BOA account. Appellant also testified that in January 1984, he went to Iran to be with his sick mother. Although he intended to spend only 15 days in Iran, he was prevented from returning until 1986 because he did not have a passport. Prior to his departure, he asked a friend, Manu Hashemi, to manage the stations in his absence. He made out the SPNB account checks to "cash," postdated them for March even though he expected to be back by then, and left them with Hashemi to cover gasoline deliveries.

The trial court acquitted appellant on the grand theft charge but found him guilty of the 26 counts of passing checks with insufficient funds. He was sentenced pursuant to section 1170(h) to a term of one year in county jail followed by three years' mandatory supervision.

## DISCUSSION

### I.–III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV. *Sentence*

#### A. *Section 654**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

#### B. *Victim Restitution*

Saberi and Allen submitted written statements of their losses, which were attached to the probation report. Saberi claimed a loss of $45,000 from "kited checks that I had to pay as guarantor," explaining, "I got a call from our bank that our account was overdrawn $45,000." Allen claimed that, in 1988, Bank of America sued him for $232,000; the parties eventually settled for $36,000; in 1989, Allen borrowed the funds to pay Bank of America; and he subsequently had to sell his house to pay off the loan. In addition to the $36,000 payment to Bank of America, he incurred losses retaining an attorney to represent him in the lawsuit, paying interest on the loan, and paying realtor fees in connection with the sale of his house. Allen also claimed appellant "left a bad debt with Shell Oil Company in the amount of approximately $8,000. Since my name was on the lease, Shell Oil held me

---

*See footnote, *ante*, page 185.

responsible. I settled the debt with Shell Oil for approximately $4,000." The trial court ordered appellant to pay restitution for all of the above losses: $45,000 to Saberi and $55,300 to Allen, plus 10 percent interest accruing from 1984.

1. *Appellant did not forfeit his challenges to the restitution order**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Section 1202.4 limits the scope of the allowable victim restitution*

Appellant first argues the losses were not caused by the crimes he was convicted of. The scope of the trial court's authority with respect to victim restitution depends on whether the restitution is ordered pursuant to section 1202.4 or as a condition of probation pursuant to section 1203.1. "[U]nder section 1203.1, 'California courts have long interpreted the trial courts' discretion to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction.' " (*People v. Anderson* (2010) 50 Cal.4th 19, 27 [112 Cal.Rptr.3d 685, 235 P.3d 11].) In contrast, section 1202.4 provides: "It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant *convicted of that crime.*" (§ 1202.4, subd. (a)(1), italics added.) Accordingly, "when a court imposes a prison sentence following trial, section 1202.4 limits the scope of victim restitution to losses caused by the criminal conduct for which the defendant sustained the conviction." (*People v. Woods* (2008) 161 Cal.App.4th 1045, 1050 [74 Cal.Rptr.3d 786] (*Woods*).) As our Supreme Court has explained: "When section 1202.4 imposes its mandatory requirements in favor of a victim's right to restitution, the statute is explicit and narrow. When section 1203.1 provides the court with discretion to achieve a defendant's reformation, its ambit is necessarily broader, allowing a sentencing court the flexibility to encourage a defendant's reformation as the circumstances of his or her case require." (*Anderson, supra*, 50 Cal.4th at p. 29.)

Appellant was sentenced to neither state prison nor probation. We are therefore faced with an issue of first impression: when a defendant is sentenced to county jail followed by mandatory supervision (known as a "split sentence"), is a victim restitution order issued pursuant to section 1202.4 or is it akin to a probation condition? (See Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2014) § 11:31, p. 11-44 (rel. 5/2014) ["It is not clear from the realignment legislation that a sentence to county jail under

---

*See footnote, *ante*, page 185.

[section 1170(h)], will be the equivalent of a state prison sentence for the purpose of victim restitution under section 1202.4."].) In response to our request for supplemental briefing on this issue, the parties split along predictable lines.

■ " 'Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*People v. Fandinola* (2013) 221 Cal.App.4th 1415, 1421–1422 [165 Cal.Rptr.3d 383] (*Fandinola*).)

We look first to the statutory language. Section 1170(h) provides that during the mandatory supervision period, "the defendant shall be supervised by the county probation officer in accordance with the terms, *conditions*, and procedures generally applicable to persons placed on probation . . . ."[8] (§ 1170(h)(5)(B), italics added.) This language suggests that victim restitution ordered as a condition of probation can also be ordered as a condition of mandatory supervision.

■ However, other statutory provisions distinguish mandatory supervision from probation. Section 1170(h) provides that courts retain the separate authority to grant probation: "Nothing in this subdivision [(§ 1170(h))] shall be construed to prevent *other* dispositions authorized by law, including . . . an order granting probation pursuant to Section 1203.1." (§ 1170(h)(4), italics

---

[8] In its entirety, section 1170(h)(5)(B) currently provides: "The portion of a defendant's sentenced term that is suspended pursuant to this paragraph shall be known as mandatory supervision, and shall begin upon release from custody. During the period of mandatory supervision, the defendant shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation, for the remaining unserved portion of the sentence imposed by the court. The period of supervision shall be mandatory, and may not be earlier terminated except by court order. Any proceeding to revoke or modify mandatory supervision under this subparagraph shall be conducted pursuant to either subdivisions (a) and (b) of Section 1203.2 or Section 1203.3. During the period when the defendant is under such supervision, unless in actual custody related to the sentence imposed by the court, the defendant shall be entitled to only actual time credit against the term of imprisonment imposed by the court. Any time period which is suspended because a person has absconded shall not be credited toward the period of supervision."

added.) Moreover, the Legislature expressly provided the prior prison sentence enhancement applies when the prior sentence was a split sentence under section 1170(h). (§ 667.5, subd. (b) ["A term imposed under the provisions of paragraph (5) of subdivision (h) of Section 1170, wherein a portion of the term is suspended by the court to allow mandatory supervision, shall qualify . . . for the purposes of the one-year enhancement."].)[9] Courts and commentators, after considering these statutory distinctions between mandatory supervision and probation, have concluded "the Legislature has decided a county jail commitment followed by mandatory supervision imposed under [section 1170(h)] is akin to a state prison commitment; it is not a grant of probation or a conditional sentence." (*Fandinola, supra,* 221 Cal.App.4th at p. 1422; accord, *People v. Martinez* (2014) 226 Cal.App.4th 759, 763 [172 Cal.Rptr.3d 320]; Couzens et al., Sentencing Cal. Crimes, *supra,* § 11-9, p. 11-10 (rel. 5/2014) ["the commitment under [section 1170(h)] generally is the equivalent of a prison sentence . . ."].)

This understanding is further supported by legislative history. An earlier version of section 1170(h) provided a sentence under that subdivision may include "a period of county jail time and a period of *mandatory probation* not to exceed the maximum possible sentence." (Stats. 2011, ch. 39, § 27, italics added.) Prior to this version's effective date, the statute was amended to omit the phrase "mandatory probation" and instead clarify the trial court's authority, when sentencing defendants under section 1170(h), to "suspend execution of a concluding portion of the term selected in the court's discretion, during which time the defendant shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation, for the remaining unserved portion of the sentence imposed by the court." (Stats. 2011, 1st Ex. Sess. 2011–2012, ch. 12, § 12.) A subsequent amendment further clarified that "[t]he portion of a defendant's sentenced term during which time he or she is supervised by the county probation officer pursuant to this subparagraph shall be known as mandatory supervision." (Stats. 2012, ch. 43, § 27; see *id.,* § 14 [adding Pen.

---

[9] In its entirety, section 667.5, subdivision (b) provides: "Except where subdivision (a) applies, where the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony; provided that no additional term shall be imposed under this subdivision for any prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended prior to a period of five years in which the defendant remained free of both the commission of an offense which results in a felony conviction, and prison custody or the imposition of a term of jail custody imposed under subdivision (h) of Section 1170 or any felony sentence that is not suspended. A term imposed under the provisions of paragraph (5) of subdivision (h) of Section 1170, wherein a portion of the term is suspended by the court to allow mandatory supervision, shall qualify as a prior county jail term for the purposes of the one-year enhancement."

Code, § 19.9, defining "mandatory supervision" for purposes of the Pen. Code].) We agree with the conclusion of another Court of Appeal that "[t]he change in the reference to the latter portion of a defendant's sentence—from probation to supervision by a probation officer—suggests that the Legislature did not intend probation and mandatory supervision to be interchangeable or otherwise identical in all respects." (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 766 [166 Cal.Rptr.3d 395] (*Ghebretensae*).)

Certain statutes enacted following passage of section 1170(h)(5)(B) suggest that the Legislature has not considered that provision to mean *all* terms, conditions, and procedures of probation apply to mandatory supervision. Specifically, following the enactment of the provision in section 1170(h)(5)(B), the Legislature amended statutes governing certain existing "terms, conditions, and procedures" of probation to expressly extend their application to mandatory supervision. For example, the Legislature amended the statute governing probation revocation to provide that its procedures also apply to mandatory supervision. (§ 1203.2, as amended by Stats. 2012, ch. 43, § 30.) The Legislative Counsel's Digest for the amending bill notes: "Under existing law . . . [a defendant sentenced to a split sentence] shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation. Existing law provides for the revocation of probation, as specified." (Legis. Counsel's Dig., Sen. Bill No. 1023 (2011–2012 Reg. Sess.).) Instead of concluding that the procedures governing revocation of probation therefore govern revocation of mandatory supervision and that any amendment would simply clarify existing law, the Legislative Counsel's Digest states, "The bill would require the revocation or modification of mandatory supervision to be made pursuant to provisions of existing law providing for the revocation of probation." (*Ibid.*) The Legislature similarly amended the following statutes governing the terms, conditions, and procedures of probation, to extend their application to mandatory supervision: the authority and procedure for trial courts to modify terms and conditions of probation (§ 1203.3, as amended by Stats. 2012, ch. 43, § 31); the authority and procedure to transfer probation cases to the probationer's county of residence (§ 1203.9, as amended by Stats. 2012, ch. 43, § 32; see *Fandinola, supra*, 221 Cal.App.4th at p. 1423); and a provision that a probationer's refusal to submit to any statutorily required HIV or hepatitis testing constitutes a violation of probation (§ 7519, subd. (b), as amended by Stats. 2012, ch. 43, § 58).[10]

---

[10] The bill enacting these changes also added, for the first time, the term "mandatory supervision." (Stats. 2012, ch. 43, §§ 27, 28.)

Moreover, the Legislature did not amend *all* statutes governing terms, conditions, and procedures of probation to extend their application to mandatory supervision, including, notably, provisions involving restitution. In enacting a revocation restitution fine for persons on mandatory supervision, the Legislature amended the statute providing for *parole* revocation restitution fines, not the one for probation revocation restitution fines. (*Fandinola, supra*, 221 Cal.App.4th at pp. 1422–1423.) In addition, while amending portions of the statutory provision governing the modification of probation terms and conditions to extend their application to mandatory supervision, the Legislature did not so extend a portion governing victim restitution, leaving that provision applicable solely to probation: "Nothing in this section shall be construed to prohibit the court from modifying the dollar amount of a restitution order pursuant to subdivision (f) of Section 1202.4 [(setting forth procedures for determining amount of victim restitution)] at any time during the term of the probation." (§ 1203.3, subd. (b)(5); see Stats. 2012, ch. 43, § 31.) The Legislature's decision to not amend this provision provides support for a conclusion that it did not intend victim restitution ordered as a condition of mandatory supervision to be identical in all respects to restitution ordered as a condition of probation.

Finally, we turn to the rationale behind the rule authorizing broader victim restitution for probation sentences. "With respect to restitution, the distinction between probation and imprisonment in state prison is not an arbitrary one. '[I]t is well settled that a court may impose a victim restitution order as a condition of probation regardless of whether or not the defendant has been convicted of the underlying crime. But this rule flows from the notion "that the granting of probation is not a right but a privilege, and that if the defendant feels that the terms of probation are harsher than the sentence for the substantive offense he is free to refuse probation." ' " (*Woods, supra*, 161 Cal.App.4th at p. 1052.)

The People contend this rationale supports their position because a defendant can similarly refuse mandatory supervision, but they cite no authority for this proposition. The plain statutory language provides otherwise. The supervision is called "*mandatory* supervision"; the Legislature underscored this aspect by adding, "[t]he period of supervision shall be *mandatory* . . . ." (§ 1170(h)(5)(B), italics added.) A recent legislative enactment supports this construction. Under current law, for persons sentenced on or after January 1, 2015, a sentence under section 1170(h) "shall" provide for a concluding portion to be mandatory supervision unless the court finds it not appropriate in a particular case in light of "the interests of justice." (§ 1170(h)(5)(A), (7), as amended by Stats. 2014, ch. 26, § 16.) This provision indicates a legislative preference for split sentences under section 1170(h) and leaves it to the court—not the defendant—to decide whether such a sentence is inappropriate in a given case. Commentators have concluded that a defendant cannot

refuse mandatory supervision. (Couzens & Bigelow, Felony Sentencing After Realignment (Mar. 4, 2014) <http://www.courts.ca.gov/partners/documents/felony_sentencing.pdf> [as of Dec. 10, 2014], p. 35 ["Supervision under a 'split' or 'blended' sentence under section 1170(h)(5)(B), unlike probation, is mandatory; the defendant may not legally refuse the supervision."]; Levenson, Cal. Criminal Procedure (The Rutter Group 2013) § 25:80, p. 25-143 (rel. 12/2013) ["If a split sentence is imposed, the defendant may not refuse mandatory supervision."].) We agree. "Mandatory" means that if the court orders a split sentence, the defendant has no option to decline supervision. Neither law nor logic supports the contrary interpretation proposed by the People. Since a defendant has no right to refuse a sentence including mandatory supervision, the rationale underlying the rule authorizing broader victim restitution in probation sentences—" ' "that if the defendant feels that the terms of probation are harsher than the sentence for the substantive offense he is free to refuse probation" ' " (*Woods, supra,* 161 Cal.App.4th at p. 1052)—does not apply.

 ■ Absent this rationale, and in light of statutory language and history that is at best ambiguous on this issue, we see no basis to impose as a condition of mandatory supervision victim restitution broader than that allowed by section 1202.4. This conclusion need not render the language in section 1170(h)(5)(B) superfluous or a nullity. There are effectively two sets of "terms, conditions, and procedures" governing probationers and persons on mandatory supervision: those imposed by the trial court under the authority of state law, and those imposed by the individual county probation officers. With respect to the former, the Legislature, as discussed above, has enacted specific statutes for persons on mandatory supervision, some of which are the same as those for probationers and some of which are different. With respect to the latter category—the terms, conditions, and procedures implemented by the individual county probation departments for handling persons under their supervision—section 1170(h)(5)(B) advises that these should be generally the same for probationers and persons on mandatory supervision. Indeed, the language focuses on the county probation officer's supervision, not the trial court's authority: "the defendant shall be *supervised by the county probation officer* in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation . . . ." (§ 1170(h)(5)(B), italics added; see *Ghebretensae, supra,* 222 Cal.App.4th at p. 764 [the relevant language "pertains to the *nature and manner of supervision by the probation officer over the defendant*—in other words, the nature and manner of the supervision itself"].) Construed in this manner, the language in section 1170(h)(5)(B) is consistent with our conclusion that the broad scope of victim restitution which can be imposed by the trial court as a condition of probation cannot be imposed as a condition of mandatory supervision.

Accordingly, we conclude victim restitution ordered as part of a sentence to county jail followed by mandatory supervision pursuant to section 1170(h) is an order pursuant to section 1202.4 and its scope is limited "to those losses arising out of the criminal activity that formed the basis of the conviction." (*Woods, supra,* 161 Cal.App.4th at p. 1049.)

3.–4.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *Mandatory Supervision Terms*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed and remanded for proceedings consistent with this opinion.

Jones, P. J., and Bruiniers, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 11, 2015, S223705.

---

[*]See footnote, *ante,* page 185.